IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs at Jackson May 5, 2015

**STATE OF TENNESSEE v. TERRY LYNN PRIEST**

**Direct Appeal from the Circuit Court for Warren County**
**No. F-13963     Larry B. Stanley, Jr., Judge**

**No. M2014-02116-CCA-R3-CD – Filed October 1, 2015**

The Appellant, Terry Lynn Priest, pled guilty to theft in an amount more than $1,000 and less than $10,000. He was sentenced as a Range II offender to five years in the Tennessee Department of Correction. On appeal, the Appellant challenges the trial court's denial of alternative sentencing. Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and ROGER A. PAGE, JJ., joined.

Robert S. Peters, Winchester, Tennessee (on appeal); and Steve Roller, McMinnville, Tennessee (at trial), for the Appellant, Terry Lynn Priest.

Herbert H. Slatery III, Attorney General and Reporter; M. Todd Ridley, Assistant Attorney General; Lisa Zavogiannis, District Attorney General; and Taffy Seagraves, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

On June 14, 2013, the Warren County Grand Jury indicted the Appellant on two counts of theft of property valued more than $1,000 but less than $10,000, a Class D felony. On June 2, 2014, the Appellant pled guilty to one count of theft of property valued more than $1,000 but less than $10,000 in exchange for the dismissal of the other count. As the factual basis for the plea, the State recited the following:

The facts that gave rise to the indictment are that Ms. Gina Waters puchased a Toyota Camry, I believe, from [the Appellant] in August[] 2011. She put $1,000.00 down and paid the sales tax and agreed to make payments on it. She did make her payments. She was given a drive-out tag that day. There was no title given to her at that moment. She never received – there was no title ever produced in order for her to get her tags. In December[] 2011 she had a wreck. There was still no title produced and the insurance company would not pay out on the vehicle because there was no title produced so effectively she was deprived of her vehicle and her money at that point. The transaction did occur in Warren County.

The plea agreement provided that the Appellant would be sentenced as a Range II, multiple offender but that the trial court would determine the length and manner of service of the sentence.

At the sentencing hearing, Trooper George Scott Dickson testified that he was assigned to the Criminal Investigation Division of the Tennessee Highway Patrol (THP). His division was responsible for state investigations of automobile thefts. Trooper Dickson testified that the regional office had received more than a dozen complaints from the sheriff's office, the district attorney's office, and investigators about the number of drivers who had been stopped by troopers and found to be "driving vehicles without any paperwork."[1] Following an investigation, the THP learned that the vehicles were originating from Gaw's Auto Mart ("Gaw's"), an automobile wholesaler in Cookeville. Trooper Dickson spoke with employees at Gaw's and learned that the Appellant had purchased a number of vehicles "on floor plan credit" and that Gaw's had retained the titles to the vehicles until Gaw's was paid by the Appellant.

Trooper Dickson said that initially, Gaw's had a good working relationship with the Appellant; he would take five or six vehicles, then, after he paid for them, he would take five or six more cars. Over time, the Appellant fell behind on his payments and began promising to pay "next time." Gaw's stopped doing business with the Appellant in 2011.

Trooper Dickson said that several purchasers were advised to file claims with the Appellant's bonding company. Trooper Dickson explained that car dealers were required

---

[1] Tennessee Code Annotated section 55-3-127(a) provides, "It is a Class C misdemeanor for any person to fail or neglect to properly endorse or deliver any certificate of title to the department, a transferee, or other person lawfully entitled to the certificate of title."

to post a bond in order to be licensed. Two people who bought cars from the Appellant filed claims against his bond and received money from the bonding company.

On cross-examination, Trooper Dickson said that "floor planning" was a common practice among automobile dealers. Trooper Dickson acknowledged that in 2008, car dealers and other businesses were adversely affected by the economic crisis. Trooper Dickson conceded that if the Appellant's customers did not pay him for their cars, "it just ha[d] a domino effect."

On redirect examination, Trooper Dickson said that during the "economic downfall," he did not investigate any other complaints that reached the "criminal level." He said that he had been unable to track down all of the cars the Appellant sold without a title.

The victim, Sherry Gina Waters, testified that she purchased a 2003 Toyota from the Appellant. The purchase price of the car was around $7,000. The victim paid the Appellant $4,000 in cash, gave him a set of rings as a $1,300 payment for the car, and arranged to pay $150 per month until the balance was paid in full. She consistently paid on time and was still paying for the car on December 24 when she was involved in a wreck. Her insurance company would not pay for the damage because the victim had never been given the title to the car. She repeatedly asked the Appellant for the title; the Appellant said that he would get it for her, but he never did.

The victim said that after her accident, she and her sister went to the internet site Carfax and

> found out that they [(sic)] was a place that had the title and I called them and talked to them and they wouldn't tell me anything. Just said that, yes, they knew about the car and seems like they told me they had the title but they couldn't release it until it was paid for and I said, well, I can't pay for it without the title.

The victim could not recall exactly how much she had paid the Appellant for the car. She acknowledged that she received $4,770 from the Appellant's bonding company.

On cross-examination, the victim said that she reviewed all of her paperwork and receipts before filling out her victim impact statement. She acknowledged that in the statement, she said the Appellant owed her $7,541.49 in restitution.

The Appellant testified that in 1992, he was convicted in federal court of conspiracy to traffic marijuana and conspiracy to steal whiskey. He received a sentence

of seventy-five months. He served five and one-half years in confinement and five years on parole.

The Appellant said that in 2000, he obtained a license from the Tennessee Motor Vehicle Commission to sell used cars. He said that he had been in the used car business for approximately fourteen or fifteen years and that he sold an average of 500 cars per year. The last year his business was open, car sales dropped dramatically, and he had trouble paying his debts. The motor vehicle commission inspected his business and gave him "some write-ups about record keeping." He said that the victim was the first person to complain about him to the commission.

The Appellant said that Gaw's was his main supplier of vehicles and that the vehicles he bought from them were worth from $50 to $10,000. The Appellant explained that Gaw's billed him for the cars and that he picked up the title after he sold the vehicles. The Appellant "salvaged[ or] junked" some of the cars and sold the others. The Appellant said that approximately ten percent of his clients paid cash for a vehicle.

The Appellant said that his business began to decline in 2008 and continued to deteriorate until 2011. Around the same time, the Appellant went through a divorce that had a "[m]ajor impact" on his finances. He said that he was bankrupt and that he had lost the business and his home. After his business closed, he supported himself by logging, cutting timber, and repairing old automobiles. The Appellant said that he was willing to pay restitution to the victim.

The Appellant said that he was living with his mother, who was disabled and in her mid-80s. The Appellant asked the court to grant him probation. The Appellant said that he had never had "issues" with drugs but acknowledged that he had been convicted of possession of drugs.

On cross-examination, the Appellant said that his business was mostly a "buy here-pay here lot." He said that he never performed credit checks on his customers, noting that they were usually low income people with no credit. The Appellant said that his business began waning in 2008; however, he did not have a problem until the last few months of operation.

Shawn Priest, the Appellant's son, testified that he worked with the Appellant at the car dealership for approximately five years. Priest was not working there at the time the victim bought her vehicle. Priest said that customers occasionally complained about the cars but that he and the Appellant resolved the complaints by "either trad[ing] them something that they could register at the time," repairing the cars, or returning their money. Priest believed the Appellant would comply with the conditions of probation.

Priest stated that the Appellant lived with his mother and rented a garage to work on old cars.

The State submitted the Appellant's presence report and copies of judgments of conviction. The documents reflected that on February 14, 1994, the Appellant was convicted in federal court of conspiracy to traffic marijuana and conspiracy to steal Jack Daniel's whiskey. On August 6, 1991, he was convicted in Lincoln County of possession of marijuana. On May 26, 1993, he was convicted in Warren County of the possession of more than 10 pounds but less than 70 pounds of marijuana with the intent to sell or deliver. On March 31, 1993, he was convicted in Rutherford County of conspiracy to deliver more than 10 pounds but less than 70 pounds of marijuana and of the sale of more than 10 pounds but less than 70 pounds of marijuana. The presence report also reflected that the Appellant had violated a probationary sentence on two occasions.

The trial court applied enhancement factor (1), that the Appellant had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range, and enhancement factor (14), that he used a position of public or private trust or used a professional license in a manner that significantly facilitated the commission or fulfillment of the offense. Tenn. Code Ann. § 40-35-114(1) and (14). The trial court applied mitigating factor (1), that the Appellant neither caused nor threatened serious bodily injury. Tenn. Code Ann. § 40-35-113(1). The trial court sentenced the Appellant as a Range II, multiple offender to five years.

The trial court noted that the Appellant's presence report reflected that the Appellant had violated probation on two occasions. Additionally, the victim in the instant case was 74 years old. The court said:

> I think probation after having committed the felonies and the offenses that you have in the past . . . and essentially defrauding this lady, who I won't say is elderly but she is 74 years old, in the manner that you did and having violated probation in the past I think probation would be improper.

On appeal, the Appellant challenges the trial court's denial of alternative sentencing, specifically complaining that the trial court should have considered community corrections.

## II. Analysis

Appellate courts review the length, range, or manner of service of a sentence imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012); see also State v.

Pollard, 432 S.W.3d 851, 859 (Tenn. 2013) (applying the standard to consecutive sentencing); State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012) (applying the standard to alternative sentencing).  In conducting its review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also Bise, 380 S.W.3d at 697-98. The burden is on the appellant to demonstrate the impropriety of his sentence.  See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and
>
> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

On appeal, the Appellant contends that the trial court erred by not sentencing him to community corrections.  Initially, we note that the Appellant did not request that the trial court grant community corrections; instead, the Appellant requested probation. Nevertheless, the trial court addressed the requirements of alternative sentencing in general and probation in particular.

Generally, an appellant who is an especially mitigated or standard offender convicted of a Class C, D, or E felony should be considered a favorable candidate for alternative sentencing, absent evidence to the contrary.  See Tenn. Code Ann. § 40-35-102(6).  Although the Appellant was convicted of a Class D felony, he was sentenced as a Range II, multiple offender; therefore, he is not considered a favorable candidate for alternative sentencing.  Nevertheless, an appellant is eligible for alternative sentencing if the sentence actually imposed is ten years or less.  See Tenn. Code Ann. § 40-35-303(a).

- 6 -

The Appellant's sentence meets this requirement.

When determining a defendant's suitability for alternative sentencing, courts should consider whether the following sentencing considerations, set forth in Tennessee Code Annotated section 40-35-103(1), are applicable:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Additionally, "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed." Tenn. Code Ann. § 40-35-103(5). A defendant with a long history of criminal conduct and "evincing failure of past efforts at rehabilitation" is presumed unsuitable for alternative sentencing. Tenn. Code Ann. § 40-35-102(5).

The Community Corrections Act of 1985 was enacted to provide an alternative means of punishment for "selected, nonviolent felony offenders in front end community based alternatives to incarceration." Tenn. Code Ann. § 40-36-103(1). Tennessee Code Annotated section 40-36-106(a)(1) provides that an offender who meets all of the following minimum criteria shall be considered eligible for community corrections:

> (A) Persons who, without this option, would be incarcerated in a correctional institution;
>
> (B) Persons who are convicted of property-related, or drug- or alcohol-related felony offenses or other felony offenses not involving crimes against the person as provided in title 39, chapter 13, parts 1-5;
>
> (C) Persons who are convicted of nonviolent felony offenses;
>
> (D) Persons who are convicted of felony offenses in which the use or possession of a weapon was not involved;

(E) Persons who do not demonstrate a present or past pattern of behavior indicating violence;

(F) Persons who do not demonstrate a pattern of committing violent offenses.

An offender is not automatically entitled to community corrections upon meeting the minimum requirements for eligibility.  State v. Ball, 973 S.W.2d 288, 294 (Tenn. Crim. App. 1998).

The trial court's comments indicate that its denial of alternative sentencing, which would include community corrections, was based upon a finding that measures less restrictive than confinement had frequently or recently been applied unsuccessfully to the Appellant and that he lacked potential for rehabilitation.  As we noted earlier, the Appellant has numerous prior convictions.  Despite receiving probationary sentences, the Appellant has continued to reoffend.  See State v. Alton Ray Thomas, No. M2006-00815-CCA-R3-CD, 2007 WL 465135, at *4 (Tenn. Crim. App. at Nashville, Feb. 13, 2007).  We conclude that, given the Appellant's criminal record, his failure to rehabilitate, and his previous inability to comply with the terms of release into the community, the trial court did not err by denying alternative sentencing, including community corrections.

## III.  Conclusion

In sum, we affirm the judgment of the trial court.

_____
NORMA MCGEE OGLE, JUDGE